[Cite as *State v. Ayala*, 2014-Ohio-2576.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,           CASE NO. 14-13-22

     v.

RENE F. AYALA,                O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Marysville Municipal Court
Trial Court No. CRB1300886

Judgment Affirmed

Date of Decision: June 16, 2014

APPEARANCES:

    *Alison Boggs* for Appellant

    *John M. Eufinger* for Appellee

**PRESTON, J.**

{¶1} Defendant-Appellant, Rene F. Ayala ("Ayala"), appeals the Marysville Municipal Court's judgment entry of sentence. He argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶2} This case stems from an August 8, 2013 road rage incident that took place on U.S. Route 36 in Union County, Ohio between Ayala and the victim, Eric Gilmore ("Gilmore"). (Oct. 28, 2013 Tr. at 6). Ayala was charged with one count of aggravated menacing in violation of R.C. 2903.21(A), a misdemeanor of the first degree.

{¶3} On October 28, 2013, a bench trial was held, and the trial court found Ayala guilty. (*Id.* at 51); (Doc. Nos. 24, 25). On the same day, the trial court sentenced Ayala to 180 days in jail and to pay a $600 fine. (Oct. 28, 2012 Tr. at 51); (Doc. No. 24). The trial court suspended 160 days of the jail sentence and $300 of the fine. (*Id.*); (*Id.*).

{¶4} Ayala moved for a stay of execution of his sentence pending an appeal. (Oct. 28, 2013 Tr. at 52); (Doc. No. 25). The trial court granted Ayala's motion. (*Id.*); (*Id.*). On November 26, 2013, Ayala filed a notice of appeal. (Doc. No. 20). He raises one assignment of error for our review.

**Assignment of Error**

**The trial court's decision was against the manifest weight and sufficiency of the evidence.**

{¶5} In his assignment of error, Ayala argues that there was insufficient evidence to convict him of aggravated menacing and that his conviction for aggravated menacing was against the manifest weight of the evidence. Specifically, Ayala argues that the State failed to show Gilmore subjectively believed Ayala would cause serious physical harm, which is an essential element of the offense. Ayala offers no argument concerning the other essential elements of the offense.

{¶6} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997), superseded by state constitutional amendment on other grounds as stated in *State v. Linzy*, 5th Dist. No. 2012-CA-33, 2013-Ohio-1129. As such, we address each legal concept individually.

{¶7} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997).

Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins*, 78 Ohio St.3d at 386.

{¶8} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses.

*State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶9}** R.C. 2903.21 sets forth the offense of aggravated menacing and provides: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person * * *." R.C. 2903.21(A). "'As the statute indicates, the State was required to prove that the defendant (1) knowingly, (2) caused [the victim] to believe that the defendant would cause him (3) serious physical harm.'" *State v. Hawk*, 3d Dist. Allen No. 1-03-54, 2004-Ohio-922, ¶ 25, quoting *State v. Schwartz*, 77 Ohio App.3d 484 (12th Dist.1991).

**{¶10}** At trial, the State called Gilmore to testify about the August 8, 2013 road rage incident. Gilmore stated that, as he was slowing to make a right turn, Ayala passed him, and, instead of turning, Gilmore decided to continue straight. (Oct. 28, 2013 Tr. at 6-7). Gilmore further testified that he caught up with Ayala and attempted to pass Ayala's vehicle and a blue minivan, but Ayala "sped up considerably," forcing Gilmore to return to the lane in front of Ayala's vehicle, and behind the minivan, "right before a hill." (*Id.* at 7). Gilmore "had to apply

[his] brakes considerably," causing Ayala to rear-end Gilmore's vehicle. (*Id.*).[1] As a result of the collision, Gilmore stopped his vehicle and got out to check the damage. (*Id.*).

> **{¶11}** Gilmore testified:
>
> I walked back towards the vehicle, [Ayala] got out of the car, said something to the effect of, what's your F-ing problem? Do you want to F-ing die? And there was a pause and he said, I'll cut you. At this point, I looked – happened to look down further at his hand. He had his hand kind of down at his side, and I saw a knife blade sticking out of his hand. At that point, I felt it was unwise to continue a confrontation. I backed off, went to my truck, picked up my cell phone and called 9-1-1 at that point.

(*Id.*). Gilmore stated that, by the time he turned around, Ayala "had gotten back into his car." (*Id.*). While Gilmore was on the phone with 9-1-1, he walked to the rear of his vehicle and noticed that it looked like Ayala was attempting to leave the scene. (*Id.*). Gilmore testified that he told the 9-1-1 operator that it looked like Ayala was attempting to leave. (*Id.*). At that point, another motorist, Dustin Young ("Young"), arrived at the scene. (*Id.* at 8).

---

[1] The record reflects that Gilmore was initially charged with improper passing for the traffic accident. The ticket was later amended to reckless operation. (Oct. 28, 2013 Tr. at 15-18).

{¶12} Gilmore further testified that he "was afraid that [Ayala] was going to cut [him]" because Ayala said, "[D]o you want to die?" and that "he was going to cut [Gilmore]." (*Id.* at 8). Gilmore testified that he "was a little fearful for [his] life. So [he] traveled back to [his] truck. Got away from him. [He] left his vicinity and [he] called 9-1-1." (*Id.*).

{¶13} On re-direct, Gilmore described the knife he saw Ayala holding as "a little blade, was maybe an inch or two * * *." (*Id.* at 20). Gilmore reaffirmed that he "was fearful that [Ayala] was actually going to use the knife on [him]." (*Id.*).

{¶14} The State's second witness, Young, testified about what he witnessed during the August 8, 2013 altercation. (*Id.* at 22). He testified that he arrived at the scene of the accident and saw Gilmore "very animated walking around" outside of his vehicle and Ayala backing his vehicle. (*Id.* 22-23). He asked Gilmore what was going on, and Gilmore told him that Ayala "was trying to leave the scene after he hit him and he pulled a knife on him." (*Id.* at 23). As a result, Young asked Ayala not to drive anywhere. (*Id.*). Young further testified that he asked Ayala if he had a knife on him or in his vehicle. (*Id.* at 24). He said that Ayala "said, no. That guy – the other guy's just crazy. I don't know what's going on." (*Id.*).

{¶15} The State's third witness was Trooper Ortiz of the Ohio State Highway Patrol, Marysville Post, who testified that he was dispatched to the

scene. (*Id.* at 27). He testified that, when he arrived, law enforcement officers from the Union County Sheriff's Office and a law enforcement officer from the Delaware County Sheriff's Office were already at the scene. (*Id.* at 28). Law enforcement officers from the Union County Sheriff's Office and the Delaware County Sheriff's Office responded since the initial report was that Ayala "had a knife and * * * had the other driver at knife point." (*Id.*). Trooper Ortiz testified that they searched Ayala and asked him if he had a knife. (*Id.*). He said Ayala denied having a knife, but a knife was eventually found on Ayala's belt buckle. (*Id.*).

{¶16} Trooper Ortiz identified State's Exhibit A as the knife he found on Ayala's belt buckle. (*Id.* at 29). He stated that the knife "was actually pretty difficult to locate almost. Because if – if you aren't being very vigilant, you probably would have passed it over during a search." (*Id.* at 29-30). Further, Trooper Ortiz testified that Ayala told him that "he never displayed it" and "never said anything in reference to it." (*Id.* at 30). After further questioning, Ayala admitted he told Gilmore he had a knife, but stated he never displayed it to Gilmore. (*Id.*). "[H]e told me he said that he told [Gilmore] that he had a knife. To stay away. Stay away. That he had a knife. That's what his semi direct words were." (*Id.* at 31).

{¶17} Trooper Ortiz testified that Gilmore described the knife to him "as a small metallic, completely silver object with approximately a two inch to one inch blade." (*Id.* at 30). He further stated that Gilmore's description was "pretty similar to the knife that was actually displayed." (*Id.*).

{¶18} On cross-examination, Trooper Ortiz testified that Gilmore was at fault for the road rage incident. (*Id.* at 33). However, Trooper Ortiz said, "the issue came to be is [sic] when [Ayala] pulled the knife." (*Id.*). Ayala's counsel asked Trooper Ortiz how Ayala described Gilmore's behavior toward Ayala during the incident. (*Id.*). Trooper Ortiz testified that Ayala told him that Gilmore was "very in his face" and acted very aggressively toward him. (*Id.* at 34).

{¶19} After Trooper Ortiz concluded his testimony, the State rested and the knife was admitted into the record without objection from Ayala. (*Id.* at 34).

{¶20} The defense called Ayala as a witness. (*Id.* at 35). Ayala testified that he passed Gilmore as Gilmore was turning and then Gilmore followed him. (*Id.* at 36). Gilmore attempted to pass Ayala and was "going back to this lane and back to the other." (*Id.*). Ayala said that, because of Gilmore's driving, he was concerned for his safety. (*Id.*). Eventually Gilmore passed Ayala and slammed on his brakes, causing Ayala to run into him. (*Id.*). After the accident, Ayala got out of his car to inspect it for damage. (*Id.*).

{¶21} Ayala testified:

Gilmore, he was very aggressive. And he come with [sic] me and he tried to touch me, you know, a couple of times. He was trying to engage, like, a fist fight. So I was more concerned about the damage on my car. So what I said when I touched him [sic] real close, I say – I say – I say, hey, Man. Back away from me. I got a knife and I – I – on my buckle. And I lift my shirt and I show him, you know. And but [sic] he keep [sic] charging at me. So what I did, I get back to my car and I remain in my car. I stay in my car the whole time. And he was, like, going back and forth. He was like the side of my window, you know, being all aggressive and loud. And he was on the phone. And then he got back to – close to his vehicle until the witness guy, until he arrives, you know. And then I never tried to leave.

(*Id.* at 36-37).

{¶22} Ayala's counsel asked him what he told Young and the officers about the knife. (*Id.* at 37-38). Ayala said that he told Young that he did not have a knife because he was scared. (*Id.* at 37). Further, he said that he told the officers that he did not have a knife because he thought they asked him if he had "a knife on [sic] the car." (*Id.* at 38). He testified that, once he realized that the officers were asking if he had a knife on him, he told them he had it on his belt buckle, but

-10-

that he never displayed it. (*Id.*). Ayala further testified that he was afraid of Gilmore because he was acting very "aggressively" and "violent" toward him throughout the altercation. (*Id.* at 39-40).

{¶23} On cross examination, Ayala identified State's Exhibit A as the knife he had on his belt buckle. (*Id.* at 39-40). He testified that he lifted his shirt and told Gilmore that he had a knife on his belt buckle after Gilmore tried "to swing at [him]." (*Id.* at 43). Ayala testified he told Trooper Ortiz that Gilmore tried to hit him. (*Id.*). Ayala further testified that he never took his knife off of his belt buckle and that showing Gilmore the knife in the belt buckle caused Gilmore to retreat. (*Id.* at 44). Ayala testified that once Gilmore retreated, Ayala "got back in [his] car right away." (*Id.*). After Ayala's testimony, the defense rested. (*Id.* at 45).

{¶24} The State called Trooper Ortiz for rebuttal examination. (*Id.* at 45). On rebuttal examination, Trooper Ortiz stated he heard Ayala's testimony that Gilmore tried to hit him. (*Id.*). Trooper Ortiz said, "He never said that to me. That information was never relayed to me. Today is the first day I heard that." (*Id.*).

{¶25} The defense called Ayala for rebuttal examination. (*Id.* at 46). Ayala testified that he told Trooper Ortiz that Gilmore tried to hit him while he was being questioned at the "Trooper's station." (*Id.*). After Ayala testified, the

defense rested and counsel gave their closing arguments. (*Id.* at 47-51). The trial court found Ayala guilty of aggravated menacing. (*Id.* at 51).

**{¶26}** We first review the sufficiency of the evidence supporting Ayala's aggravated menacing conviction. *See State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). As noted above, because it is the only element Ayala challenges on appeal, we review the sufficiency of the evidence supporting only the second element of the offense. There was sufficient evidence that Gilmore subjectively believed Ayala would cause serious physical harm.

**{¶27}** Ayala cites *Garfield Heights v. Greer*, 8th Dist. Cuyahoga No. 87078, 2006-Ohio-5936, in support of his argument that his conviction was against the manifest weight of the evidence. However, the decision in *Greer* is based on a sufficiency of the evidence analysis, and, as such, is discussed in our review of the sufficiency of the evidence in this case.

**{¶28}** In *Greer*, the court reversed the defendant-appellant's aggravated menacing conviction, concluding that there was insufficient evidence that the victim subjectively believed, at the time of the offense, that the defendant would cause serious physical harm. Greer "brandished a gun that even the victim questioned as being real" during a road rage incident. *Id*. at ¶ 10. "There was no evidence that he pointed the gun at the victim, or took any other action to make the

victim believe that serious physical harm would ensue." *Id.* The victim's actions, in slowing down to write down Greer's license number, then retreating home to call the police, and having to call the police a second time to tell them about the gun because he forgot to do so during his initial call, did not demonstrate that the victim subjectively believed Greer would cause serious physical harm. *Id.* Likewise, "[t]he victim did not testify to any subjective belief that Greer would cause him serious physical harm. There was no evidence that the victim was scared or rattled from the incident." *Id.* at ¶ 7.

{¶29} The facts in *Greer* are distinguishable from the facts in this case. Here, both Ayala and Gilmore were outside of their vehicles when Ayala made threatening statements to Gilmore with the knife. (Oct. 28, 2013 Tr. at 7, 36). Ayala did more than simply brandish a knife to make Gilmore believe serious physical harm would ensue. Gilmore testified that Ayala threatened to cut him and asked him if he wanted to die while holding a knife at his side. (*Id.* at 7). Gilmore testified multiple times during the hearing that he was afraid Ayala was going to cause him serious physical harm. Gilmore testified that, after Ayala threatened him with the knife, he "felt it was unwise to continue a confrontation. [He] backed off, went to [his] truck, picked up [his] cell phone and called 9-1-1 at that point." (Oct. 28, 2013 Tr. at 7). He also testified that he "was afraid that [Ayala] was going to cut [him]" because Ayala said, "[D]o you want to die?" and

that "[Ayala] was going to cut [him]." (*Id.* at 8). Gilmore testified that he "was a little fearful for [his] life. So [he] traveled back to [his] truck. Got away from him. [He] left his vicinity and [he] called 9-1-1." (*Id.*). Lastly, Gilmore reaffirmed on re-direct that he "was fearful that he was actually going to use the knife on [him]." (*Id.* at 20).

**{¶30}** Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Gilmore subjectively believed he would suffer serious physical harm and, therefore, that Ayala committed aggravated menacing. The evidence demonstrated that Ayala made threatening statements, while brandishing a knife, to Gilmore that caused Gilmore to believe that Ayala would cause him serious physical harm. This is sufficient evidence to support an aggravated menacing conviction. *See State v. Seabeck*, 9th Dist. Summit No. 25190, 2011-Ohio-3942, ¶ 14-17 (concluding that there was sufficient evidence supporting the defendant's menacing conviction where the defendant was angry and belligerent toward the officer arresting him and stated, "When I beat this, I am going to make sure that I come out to Hudson and see you," which caused the officer to believe that the defendant would cause serious physical harm).

**{¶31}** Having concluded that sufficient evidence supports Ayala's conviction, we next address Ayala's argument that his conviction was against the

manifest weight of the evidence. Again, we apply the manifest-weight standard only to the second element of the offense -- Gilmore subjectively believed, at the time of the offense, that Ayala would cause serious physical harm. In support of his argument, Ayala argues that Gilmore's actions did not demonstrate a subjective belief that Ayala would cause serious physical harm.

{¶32} Ayala's first argument that Gilmore did not subjectively believe he was going to suffer serious physical harm because Gilmore testified he was only "flustered at the time," is belied by the record. (*Id.* at 13); (Appellant's Brief at 6). Gilmore testified that he was "flustered at the time," but, as we summarized in our sufficiency of the evidence analysis, Gilmore stated multiple other times during the trial that he was afraid Ayala was going to use the knife on him.

{¶33} Ayala's second argument that Gilmore did not subjectively believe he was going to suffer serious physical harm because he turned his back on Ayala is contradicted by fact and law. (*See* Appellant's Brief at 6). As we summarized above, Gilmore thought it was unwise to continue the confrontation when Ayala threatened him and showed him a knife, so he retreated to his truck to call 9-1-1. By leaving Ayala's "vicinity" and going back to his truck, Gilmore was announcing his intention to withdraw from the conflict. *See State v. Melchior*, 56 Ohio St.2d 15, 22 (1978) (withdrawing "from the affray or difficulty in good faith" announces "desire for peace"). Even as noted in *Greer*, Gilmore's retreat

"'is evidence of [Gilmore's] apprehension toward [Ayala] and possible serious physical [harm].'" *Greer*, 2006-Ohio-5936, ¶ 8, quoting *State v. Guddy*, 8th Dist. Cuyahoga No. 80390, 2002-Ohio-3102, ¶ 28.

**{¶34}** Ayala's third argument that Gilmore did not subjectively believe he was going to suffer serious physical harm because he remained outside his vehicle after the altercation and continuously walked toward Ayala's car back to his truck is also belied by the record. (*See* Appellant's Brief at 6). Once Gilmore announced his intention to withdraw from the conflict by retreating to his truck, Ayala retreated to his car, thereby, also withdrawing from the conflict. Ayala testified that he immediately returned to his car once he saw Gilmore retreat. (Oct. 28, 2013 Tr. at 44). Gilmore also testified that he saw Ayala "had gotten back into his car" after he returned to his truck to call 9-1-1. (*Id.* at 7).

**{¶35}** After reviewing the record, we cannot conclude that the trier of fact clearly lost its way. The record shows Ayala made threatening statements to Gilmore while brandishing a knife. The evidence supports the trial court's conclusion that Gilmore believed Ayala's threats. Gilmore testified that he was fearful that Ayala was going to use the knife on him. A reviewing court must allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *DeHass*, 10 Ohio St.2d at 231. *Accord Seabeck*, 2011-Ohio-3942, at ¶ 27, citing *State v. Singer*, 9th Dist. Summit

No. 25321, 2011-Ohio-917, ¶ 12. Given this evidence, it was not against the manifest weight of the evidence for the trial court to conclude Gilmore subjectively believed Ayala would cause him serious physical harm. Therefore, we find that Ayala's conviction was not against the manifest weight of the evidence.

{¶36} Ayala's assignment of error is overruled.

{¶37} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., concurs.**

**ROGERS, J., concurs in Judgment Only.**

**/jlr**